## COMMONWEALTH *vs.* JOSE M. LOPEZ.

Suffolk. September 8, 2010. - December 6, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Firearms. Narcotic Drugs. Constitutional Law,* Search and seizure. *Search and Seizure,* Motel room, Consent. *Consent.*

In an appeal from an order entered by a District Court judge suppressing a firearm and a controlled substance that were discovered by a police officer when he entered a hotel room to retrieve a discarded needle, this court concluded that the entry was a search in the constitutional sense. [388-391] GANTS, J., concurring.

In an appeal from an order entered by a District Court judge suppressing a firearm and a controlled substance that were discovered by a police officer when he entered a hotel room to retrieve a discarded needle, this court concluded that the warrantless entry of the room by the officer was without valid consent, as it was not predicated on actual or apparent authority, in violation of art. 14 of the Massachusetts Declaration of Rights, where it was not objectively reasonable in the circumstances for the officer who knocked on the door to believe that the woman who answered had authority to permit him to enter (in that the officer ignored facts that called into question the information he held), and where the officer did not conduct a diligent inquiry concerning the woman's relationship to the premises (and, thus, her authority to give consent). [391-398] COWIN, J., dissenting, with whom SPINA, J., joined.

COMPLAINT received and sworn to in the Chelsea Division of the District Court Department on August 31, 2005.

A pretrial motion to suppress evidence was heard by *Diana L. Maldonado*, J.

An application for leave to prosecute an interlocutory appeal was allowed by *Spina*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Andrea Petersen* for the defendant.

*Kathleen Celio*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. A complaint issued in the Chelsea Division of the District Court Department charging the defendant, Jose M. Lopez, with carrying a firearm without a license, G. L. c. 269, § 10 (*a*); possession of a firearm without an identification card, G. L. c. 269, § 10 (*h*); receiving stolen property, G. L. c. 266, § 60; and possession of a class D substance, G. L. c. 94C, § 34. The defendant, as relevant here, moved to suppress evidence (a firearm and marijuana),[1] claiming that it was unlawfully obtained by police without a warrant and in the absence of valid consent to enter his residence in violation of both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.[2] After an evidentiary hearing, a District Court judge granted the defendant's motion and entered a memorandum of decision and order suppressing the firearm and marijuana. A single justice of this court granted the Commonwealth leave to pursue an interlocutory appeal from the judge's order in the Appeals Court, see Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996). By a divided panel, the Appeals Court reversed the allowance of the defendant's motion to suppress. *Commonwealth* v. *Lopez,* 74 Mass. App. Ct. 815, 826 (2009). We granted his application for further appellate review. Because, in the circumstances, it was not objectively reasonable for a police officer to believe that the woman who permitted him to enter the defendant's residence was authorized to consent to the warrantless entry, we conclude that the entry into his residence and subsequent seizure of evidence therein was unlawful under art. 14. We therefore affirm the order allowing the defendant's motion to suppress.

1. *Background.* In reviewing a decision on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of [her] ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott,* 440 Mass. 642, 646 (2004), quoting *Commonwealth* v. *Jimenez,* 438 Mass. 213, 218 (2002). We summarize the judge's findings of fact, supplemented with uncontested testimony adduced at the

---

[1]The defendant also sought suppression of statements. That issue was not addressed in the suppression order before us, and is not part of this appeal.

[2]In his motion to suppress, the defendant did not argue that art. 14 of the Massachusetts Declaration of Rights affords him any greater protection than the Fourth Amendment to the United States Constitution.

evidentiary hearing.[3] See *Commonwealth* v. *Garcia*, 443 Mass. 824, 828 (2005).

On the evening of August 30, 2005, Revere police Officer Mark Desimone and his partner were assisting another officer on a matter unrelated to this case at the Ocean Lodge, a two-story, forty-room motel on Revere Beach Boulevard in Revere.[4] The motel was notorious for excessive drug dealing, drug use, assaults, and robberies that occurred on the premises. About three months prior, Desimone regularly had visited the motel while on patrol, stopping in almost every night to run warrant checks against the names appearing on the motel's guest log and on identification cards held by the management. The manager of the motel was known to police as "Victor." Desimone had been acquainted with Victor for about seven months, and always found him "extremely cooperative." On occasions where Desimone would review the guest log with Victor, Victor told Desimone that he resided in room 138, which was a detached building about the size of a "shed" located behind a restaurant at the front right of the motel. Room 138 contained two bedrooms and a bathroom, and usually was rented to or occupied by the motel manager.

As Desimone and his partner were leaving the Ocean Lodge that evening at about 9 p.m., they encountered Victor, who asked them to retrieve a needle that had been discarded on the premises of the motel. This service was one that the police regularly provided. Desimone explained to Victor that they had another matter to which they had to respond, but would come back when finished.

At approximately 10 p.m., Desimone and his partner returned to the motel. They were dressed in uniform, and they drove an unmarked police vehicle. Desimone went to the motel's office, asked for Victor, and was told that Victor "was in his room." Believing (based on past information provided by Victor while

---

[3] We "supplement a judge's findings of facts if the evidence is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony." *Commonwealth* v. *Isaiah I.*, 448 Mass. 334, 337 (2007). Here, the only evidence before the judge was the testimony of Revere police Officer Mark Desimone, who was called by the prosecution. Based on the judge's findings, it is clear that she implicitly credited his uncontradicted testimony.

[4] The Ocean Lodge closed in October, 2005.

previously reviewing the motel's guest log) Victor's room to be room 138, Desimone went over to that room while his partner remained in the unmarked vehicle.

Desimone knocked on the door to room 138 and said, "Hello, Victor." A woman, who was unknown to Desimone, opened the door "all the way." Desimone stated, "Hello, is Victor here?" The woman looked at him "funny — like a deer in the headlights type of look" and replied, "I don't know." Desimone showed the woman the needle disposal canister that he held in his hand and told her that Victor had asked him to pick up a needle. The woman said, "Oh, okay." Desimone asked, "Can I come in?" to which the woman said, "Yeah, sure." During this exchange, Desimone observed that the woman "appeared to be nervous." He testified: "She looked kind of stunned, and I wasn't sure if maybe she was maybe under the influence of drugs or what it was, but she looked a little . . . staring and just kind of shocked look."[5]

Desimone entered the residence and the woman closed the door behind him. In the bedroom to Desimone's right, the door to which was open, he observed three men sitting on a bed together with a pile of a green leafy substance, which he believed from his training to be marijuana. Desimone did not recognize any of the men. The men appeared to be nervous and started to move their hands. Desimone knew of an ongoing "drug sting" taking place in the motel that night involving both the Revere and State police and he did not want to "make any arrests or bring any type of attention" to the motel. Consequently, he told the men to "relax" and that he was "not [there] to arrest anyone for marijuana," but rather had come inside to "pick up a needle." He asked them to put up their hands. The men looked away from Desimone to their right toward the other end of the room that was not visible to Desimone. Desimone heard some noise

[5]Although there were some suggestions during oral argument that the woman who answered the door to room 138 was "stoned," there was no evidence at the evidentiary hearing that the woman had used any drugs. The only evidence concerning this woman's personal ingestion of drugs was Desimone's equivocal testimony that "maybe" she was "under the influence of drugs" because she was "staring" and looked "shocked." He did not testify concerning any of the woman's physical features or any possible physical limitations exhibited by the woman to support his suggestion that she possibly was "under the influence of drugs."

coming from that direction. He moved to look through the doorway and observed a fourth man, the defendant, in the far corner of the room. As Desimone was moving to look inside the room, he heard "a thump" that came from the small, metal trash barrel in the room, which was about six inches from the defendant. Desimone asked the defendant to go over with the other men.

Desimone called for his partner who, together with another officer, promptly entered. The officers moved the men, including the defendant, into the other room where the woman was. Desimone recovered a loaded .38 revolver from the trash barrel. He asked the defendant to show him his license to carry a firearm; the defendant responded that he did not have a license. The men, including the defendant, were placed under arrest.[6]

Later that evening, Desimone spoke with Victor. Victor explained that he had rented room 138 to four men, one of whom was the defendant.[7] Victor had seen the firearm the previous day and wanted to tell Desimone about it. Because he thought he may be overheard, Victor told Desimone that he had a needle instead of informing him about the gun.

In her findings and decision, the judge determined that the woman who had allowed Desimone to enter room 138 had given consent to enter that was "clear, unambiguous and voluntary." The judge, however, concluded that the Commonwealth did not establish that the woman possessed the actual or apparent authority to consent to the entry because the only thing that the police knew about her was that she was the person who had opened the door. For this same reason, the judge stated that there was nothing in the facts to suggest a reasonable (but mistaken) belief that the woman possessed the actual or apparent authority to consent to the entry. Because the woman had no authority to give consent and the police had entered without a warrant, the judge allowed the defendant's motion to suppress.

By a divided panel, the Appeals Court reversed. *Common-*

---

[6]There is nothing in the record identifying the woman who answered the door to the defendant's residence.

[7]This uncontested evidence came in through the Commonwealth's witness, Desimone, at the evidentiary hearing on the motion to suppress. The Commonwealth does not challenge the fact that room 138 had been lawfully rented to the defendant for him (and others) to reside there.

*wealth* v. *Lopez*, 74 Mass. App. Ct. 815, 826 (2009). The Appeals Court determined that officer Desimone did not need to "second-guess the woman's consent to enter" room 138 because his "purpose in entering . . . was neither to search nor arrest, but merely to retrieve the needle that Victor has asked him to pick up." *Id.* at 821, 822. Thus, the Appeals Court concluded that Desimone's entry into room 138 "was not a search in the constitutional sense." *Id.* at 821. The Appeals Court went on to state that it was reasonable for Desimone "to assume that the woman had authority to allow him to enter" room 138 because he had no intention of conducting a search and there was nothing to put him on notice that she lacked authority to consent to the entry. *Id.* at 824. The Appeals Court explained that there were no circumstances warranting further inquiry from Desimone concerning the woman's authority to consent because the woman never acted as though she could not permit him to enter; the woman was an adult; the woman did not hesitate in opening the door; the woman did not seek permission or guidance from anyone inside before allowing him to enter; the entry occurred at about 10 P.M.; and neither the defendant nor any of the other occupants inside protested or objected to the woman's consent to his entry. *Id.* at 823-824. Once lawfully inside, the Appeals Court concluded that Desimone could lawfully seize the marijuana that was in plain view and the firearm that was recovered in a permissible limited protective search of the residence. *Id.* at 825. Last, the Appeals Court rejected the defendant's contention that the woman's consent to enter was involuntary, concluding that Desimone's actions "were anything but coercive." *Id.* at 822-823 n.9.

2. *Discussion. a. Significance of the entry.* As an initial matter, we disagree with the Appeals Court's conclusion that Desimone's entry into room 138 was not a "search" in the constitutional sense because Desimone did not enter with the purpose of conducting a search.[8] See *Commonwealth* v. *Lopez, supra* at 821. To be sure, the Fourth Amendment and art. 14 expressly

---

[8]The Commonwealth does not advance this argument, namely, that a search in the constitutional sense did not occur on account of Desimone's intent in entering room 138; rather, the Commonwealth's focus on intent, which we later discuss, pertains only to whether the entry was consensual. We nevertheless address the issue because we believe the Appeals Court's analysis was misplaced.

proscribe unreasonable "searches and seizures" and do not specifically speak to "entries." See Fourth Amendment ("The right of the people to be secure in their persons, houses, papers and effects, against unreasonable *searches* and seizures, shall not be violated . . ." [emphasis added]); art. 14 ("Every subject has a right to be secure from all unreasonable *searches*, and seizures, of his person, his houses, his papers, and all his possessions" [emphasis added]).

It has been settled law, however, that whether a "search" in the constitutional sense occurs depends on whether the police conduct has intruded on a constitutionally protected reasonable expectation of privacy. See *Kyllo* v. *United States*, 533 U.S. 27, 33 (2001); *Commonwealth* v. *Porter P.*, 456 Mass. 254, 259 (2010), and cases cited. Here, the Commonwealth does not dispute, as it cannot, that the defendant possessed a constitutionally protected reasonable expectation of privacy in room 138, the motel room (which contained two bedrooms) that he rented from Victor and that served as his *home*. The full protection of the Fourth Amendment and art. 14 expressly extends to "houses," see Fourth Amendment ("The right of the people to be secure in their persons, *houses*, papers and effects, against unreasonable searches and seizures, shall not be violated . . ." [emphasis added]); art. 14 ("Every subject has a right to be secure from all unreasonable searches, and seizures, of his person, his *houses*, his papers, and all his possessions" [emphasis added]); *Payton* v. *New York*, 445 U.S. 573, 585 (1980) (Fourth Amendment applies to all invasions by government "of the sanctity of a man's home"), and has been construed to extend also to the legitimate privacy expectations of a motel occupant. See *Stoner* v. *California*, 376 U.S. 483, 489-490 (1964) (guest in hotel room enjoys protections against unreasonable searches and seizures under Fourth Amendment "[n]o less than a tenant of a house, or the occupant of a room in a boarding house"); *Commonwealth* v. *Paszko*, 391 Mass. 164, 184-185 (1984) (defendant may have reasonable expectation of privacy in motel room during rental period and prior to abandonment of room). Lest there be any doubt concerning the application of the Fourth Amendment and art. 14 to entries into homes, the United States Supreme Court expressly has stated that the "physical *entry* of the home is the

chief evil against which the wording of the Fourth Amendment is directed" (emphasis added). *United States* v. *United States Dist. Court for the E. Dist. of Mich.*, 407 U.S. 297, 313 (1972). See *Kyllo* v. *United States, supra* at 37 ("In the home, our cases show, *all* details are intimate details, because the entire area is held safe from prying government eyes" [emphasis in original]); *Illinois* v. *Rodriguez*, 497 U.S. 177, 181 (1990) ("Fourth Amendment generally prohibits the warrantless *entry* of a person's home" [emphasis added]). We also have specified that "[w]arrantless *entries* into the home are prohibited by the Fourth Amendment . . . and art. 14 . . . absent either probable cause and exigent circumstances, or consent" (emphasis added). *Commonwealth* v. *Rogers*, 444 Mass. 234, 236 (2005).

While the inquiry into an officer's intent in entering a person's home without a warrant may bear on whether some type of exigency justified the warrantless entry, it is not a factor in determining whether a search in the constitutional sense took place. See 3 W.R. LaFave, Search and Seizure § 6.6, at 451 (4th ed. 2004) (police may enter premises without warrant "for a variety of . . . purposes," including to apprehend persons committing serious criminal offenses, to aid those who are in danger of physical harm, to assist those who cannot care for themselves, and to provide other services on emergency basis). Simply put, the purpose of the entry does not serve to vitiate the intrusion. *Commonwealth* v. *Forde*, 367 Mass. 798, 805 (1975) ("The right of police officers to enter into a home, *for whatever purpose*, represents a serious governmental intrusion into one's privacy" [emphasis added]). See *Commonwealth* v. *Cruz*, 442 Mass. 299, 307 (2004) (entry into defendant's home without arrest or search warrant and in absence of exigent circumstances violated Fourth Amendment and art. 14). The point was underscored in *Payton* v. *New York, supra* at 589-590:

"[T]he critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home. The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than

when bounded by the unambiguous physical dimensions of an individual's home — a zone that finds its roots in clear and specific constitutional terms: 'The right of the people to be secure in their . . . houses . . . shall not be violated.' That language unequivocally establishes the proposition that '[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.' *Silverman* v. *United States*, 365 U.S. 505, 511 [(1961)]. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."

See *Kyllo* v. *United States, supra* at 40 (concluding that government's use of thermal-imaging device aimed at private home from street to detect relative amounts of heat from within home constitutes "search" within meaning of Fourth Amendment and is presumptively unreasonable without warrant).

Thus, where the Commonwealth is not arguing that exigent circumstances justified Desimone's entry into room 138, we do not consider his intent in entering in determining whether the entry constituted a search in the constitutional sense. Because Desimone's entry into room 138 was an intrusion to the defendant's home, a place where he is to enjoy a constitutionally protected reasonable expectation of privacy and is to be shielded from unwarranted intrusions on that privacy, we conclude that Desimone's entry into room 138 was an intrusion that constituted a "search" in the constitutional sense.

b. *Consent exception.* In addition to situations establishing probable cause or exigent circumstances, warrantless entries into a home have been found to be permissible under the Fourth Amendment and art. 14 where they are undertaken with consent. *Commonwealth* v. *Rogers, supra* (warrantless entries into home "are prohibited by the Fourth Amendment . . . and art. 14 . . . absent either probable cause and exigent circumstances, or consent"). The Commonwealth bears the burden "to establish its theory of entry and prove lawful entry based on that theory." *Id.* at 245. See *Illinois* v. *Rodriguez, supra.* Because the defendant had a reasonable expectation of privacy in his home and

because Desimone entered his home without a search warrant and without any claim of exigency, the Commonwealth must prove that the police entry was reasonable because it was based on consent.

"When the police rely on consent to justify a warrantless entry, under both the Fourth Amendment and art. 14, the prosecution 'has the burden of proving that the consent was, in fact, freely and voluntarily given.' " *Commonwealth* v. *Rogers, supra* at 237, quoting *Bumper* v. *North Carolina*, 391 U.S. 543, 548 (1968). In addition, the person giving the consent must have the authority to do so. *Illinois* v. *Rodriguez, supra* at 181-182. It is this latter requirement that is at issue in this case.

A person has the actual authority to give consent in a variety of situations. It may be given "from the individual whose property is searched." *Illinois* v. *Rodriguez, supra* at 181. Consent may also be provided from a third party possessing "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States* v. *Matlock*, 415 U.S. 164, 171 (1974). See *Commonwealth* v. *Porter P.*, 456 Mass. 254, 262 (2010), and cases cited. Common authority is "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States* v. *Matlock, supra* at 171 n.7.[9]

Another type of authority to give consent is apparent authority. The seminal case concerning this type of authority and involving the Fourth Amendment is *Illinois* v. *Rodriguez, supra* at 185-186, in which the United States Supreme Court held that

---

[9]In *Commonwealth* v. *Porter P.*, 456 Mass. 254, 264-265 (2010), in providing guidance concerning who has common authority over a residence, we declared that, under art. 14, "a person may have actual authority to consent to a warrantless search of a home by the police only if (1) the person is a coinhabitant with a shared right of access to the home, that is, the person lives in the home, either as a member of the family, a roommate, or a houseguest whose stay is of substantial duration and who is given full access to the home; or (2) the person, generally a landlord, shows the police a written contract entitling that person to allow the police to enter the home to search for and seize contraband or evidence. No such entitlement may reasonably be presumed by custom or oral agreement."

the Fourth Amendment's proscription of "unreasonable searches and seizures" is not violated when a warrantless entry into a home is based on the consent of a third party who the police, at the time of entry, reasonably, but mistakenly, believed had common authority over the premises. The Court noted that the touchstone of reasonableness does not always require that the government will be factually correct in its assessments.[10] *Id.* at 184, 185-186. The Court also explained:

> "[W]hat we hold today does not suggest that law enforcement officers may always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry. As with other factual determinations bearing upon search and seizure, determination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the moment . . . "warrant a man of reasonable caution in the belief" ' that the consenting party had authority over the premises? *Terry* v. *Ohio*, 392 U.S. 1, 21-22 (1968). If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid."[11]

*Illinois* v. *Rodriguez, supra* at 188-189. The critical inquiry, as can be seen, is the relationship between the third party and the premises. *Id.* See *United States* v. *McAlpine*, 919 F.2d 1461, 1464 (10th Cir. 1990).

We recently adopted the doctrine of apparent authority, under art. 14, in *Commonwealth* v. *Porter P., supra* at 269. We did so, however, in the context of a search of, and not an entry into, a home. *Id.* at 271 & n.16. We expressly reserved decision in the context of entry, noting that we had granted further appellate review in *Commonwealth* v. *Lopez*, 74 Mass. App. Ct. 815 (2009).

---

[10]The doctrine of apparent authority has been limited and does not encompass an entry premised on a mistake of law. See *Commonwealth* v. *Porter P., supra* at 267-268, and cases cited.

[11]The dissent inappropriately narrows the pertinent inquiry concerning reasonableness under *Illinois* v. *Rodriguez*, 497 U.S. 177, 188-189 (1990), ignoring the entirety of the passage quoted above. *Post* at 401-402.

*Commonwealth* v. *Porter P., supra* at 271 n.16. Because, as we earlier stated, a warrantless entry into a home constitutes a search in the constitutional sense, there is no reason in this case to draw a distinction between searches and entries of homes, and we conclude that what we said in the *Porter P.* case applies here as well.

In *Commonwealth* v. *Porter P., supra* at 271, relying on *Illinois* v. *Rodriguez, supra,* we stated that "we do not believe that art. 14 is violated if a warrantless search of a home occurs after a police officer obtains the voluntary consent of a person he reasonably believes, after diligent inquiry, has common authority over the home, but it turns out that the person lacked common authority." We went on to specify the "two basic steps" required to conduct a diligent inquiry:

> "First, the police officer must base his conclusion of actual authority on facts, not assumptions or impressions. He must continue his inquiry until he has reliable information on which to base a finding of actual authority to consent. . . . Second, even when the consenting individual explicitly asserts that he lives there, if 'the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth,' the police officer must make further inquiry to resolve the ambiguity. [*Illinois* v.] *Rodriguez, supra* at 188. The police officer owes a duty to explore, rather than ignore, contrary facts tending to suggest that the person consenting to the search lacks actual authority. Police must not only thoroughly question the individual consenting to the search with respect to his or her actual authority, but also pay close attention to whether the surrounding circumstances indicate that the consenting individual is truthful and accurate in asserting common authority over the premises."

*Commonwealth* v. *Porter P., supra* at 271-272.

In this case, the Commonwealth concedes that the woman who answered the door to the defendant's home did not have the actual authority to let Desimone inside. The issue, therefore, is whether she had apparent authority to permit his entry. We analyze the issue under art. 14, referencing some Fourth Amendment jurisprudence where instructive and not inconsistent with art. 14. See *Commonwealth* v. *Porter P., supra* at 265 n.9.

We conclude that, on the facts of this case, it was not objectively reasonable for Desimone to have thought that the woman who came to the door had the authority to permit him to enter. Consequently, there was no valid consent to justify the warrantless entry into the defendant's home, and the entry violated art. 14.

Before knocking, Desimone believed that Victor lived in room 138 (and had no information that Victor lived with anyone or was involved with a woman). When the woman, who was not known to Desimone, opened the door, as opposed to Victor, a reasonable officer initially should have, at best, doubted the woman's authority to consent to his entry of what he believed to be Victor's residence. The circumstances created a "duty to explore, rather than ignore," *Commonwealth* v. *Porter P., supra* at 272, the woman's relationship to the *premises* to establish whether she possessed common authority, or even actual authority, over the premises. Instead, Desimone inquired of the woman whether Victor was present, to which he was given a "funny . . . type of look," and the ambiguous response, "I don't know." In these circumstances, before and at the time of Desimone's entry, whether the woman had any kind of authority to consent to Desimone's entry was at best questionable, thereby prompting further exploration concerning her relationship to the premises.[12] See *Commonwealth* v. *Porter P., supra* at 272. See also 4 W.R. LaFave, Search and Seizure § 8.3 (g), at 177 (4th

[12]The dissent imagines various scenarios to contend that no ambiguity existed in the circumstances. The dissent suggests that Desimone reasonably could have believed that the woman who opened the door to room 138 shared the room with Victor or was otherwise authorized to be on the premises because there was no information that the room was being rented to others and because of the lateness of the hour. *Post* at 402. That there was no information that the room was being rented to others is not the same as hard facts, such as actual information from another that the woman, or someone else, was renting or living in, or even appeared to be living in, room 138. Numerous assumptions could be drawn from "the lateness of the hour." Desimone could have speculated that Victor had a girl friend, or that Victor was being robbed by a woman. Based on the record, which indicates that the police responded to calls at the hotel regarding prostitutes being robbed and providing their services there, Desimone could have speculated that Victor had engaged the services of a prostitute and was in the shower when the officer knocked on the door. All these scenarios could be possible or reasonable for a police officer to believe, but art. 14 requires an officer's conclusions to be based "on facts, not assumptions or impressions." *Commonwealth* v. *Porter P.,*

ed. 2004) ("under a sound application of the apparent authority rule the police must be required to make reasonable inquiries when they find themselves in ambiguous circumstances").

The Commonwealth points to a number of factors to argue that it was reasonable for Desimone to believe that the woman had authority to allow him into the motel room. We do not find them instructive in view of the fact that the ambiguity that initially existed was never negated. For example, the Commonwealth's assertion that Desimone had no reason to think that the woman did *not* have authority to permit him to enter room 138 is belied by the record, namely, he believed Victor resided in room 138, and had no information concerning anyone else living there also. Further, we agree with the well-written and reasoned dissent from the decision of the Appeals Court in this case, *Commonwealth* v. *Lopez, supra* at 834 (Lenk, J., dissenting), that "the Commonwealth needs to prove that there were facts affirmatively known to the officer that would permit him reasonably to believe that the person giving consent had authority over the premises [and] [i]t is not enough to say that the officer was not aware of any facts showing she had no such authority." The Commonwealth also suggests that officers are entitled to assume without inquiry that a person who answers a door in response to their knock has the authority to let them enter. While this assumption may be true in certain circumstances, it is not a universal rule, particularly where other facts suggest a conclusion to the contrary or call that assumption into doubt.[13] See *United States* v. *Powell*, 929 F. Supp. 231, 235 & n.10

*supra* at 271. No less should be required when police seek to invade or intrude on the sanctity of the home (in the absence of exigency). Thus, the only facts before Desimone were that an unknown woman answered the door and she gave an ambiguous response ("I don't know") to his question concerning Victor's whereabouts. These facts created an ambiguous situation at best concerning the woman's relationship to the premises. The fact that Desimone inquired about Victor's whereabouts suggests that he was uncertain as to the status of this unknown woman.

[13]The dissent essentially also relies on this assumption by stating that no ambiguity existed because the unknown woman who answered what Desimone believed to be Victor's door "acted at all times as though [s]he were the keeper of the door." The dissent does not point to any facts in the record to support this statement (other than the mere fact that the unknown woman answered the door). *Post* at 402, quoting *United States* v. *Rosario*, 962 F.2d 733, 738 (7th Cir. 1992).

(S.D. W. Va. 1996) (application of rule that police may assume person who answered door has authority to permit entry was "inappropriate" in view of other information provided at time). Indeed, the mere fact of access, without more, does not mean that the access was authorized. See *United States* v. *Reid*, 226 F.3d 1020, 1025 (9th Cir. 2000). In addition, we conclude that Desimone's intent in requesting entry into the premises (namely, not intending to conduct a search) was irrelevant to the issue whether consent was provided, because the pertinent inquiry is the nature of the consenter's relationship to the premises.[14] See *Illinois* v. *Rodriguez, supra* at 188-189 (critical inquiry is relationship between consenting party and premises); 3 W.R. LaFave, Search and Seizure § 6.6(c), at 478-479 (4th ed. 2004) (even where police seek to enter premises for purposes of discussing official matter, they must rely on consent to gain admission and "the nature of the premises must be considered in deciding whether the officer [as any other caller] needs consent to enter").

The fact that it was approximately 10 P.M., and that room 138 contained small rooms therein, does not compel a conclusion that Desimone "could reasonably think that the woman opened the door because she either was an occupant of the room or was opening the door at the occupant's request." See note 13, *supra.* There is no evidence in the record concerning Desimone's knowledge of the room sizes before he was permitted entry into room 138. In addition, there is no evidence that Desimone had any knowledge (or even suspected) that there were any other occupants inside room 138 (apart possibly from Victor) when the unknown woman answered the door. Even if Desimone suspected

---

[14]We are aware of cases from other jurisdictions that have determined consent to have been valid in circumstances where the purpose of the warrantless police entry (and where no exigent circumstances existed) was not to conduct a search. See, e.g., *Davis* v. *United States*, 327 F.2d 301, 303-305 (9th Cir. 1964) (determining police entry lawful based on manner of entry and intent of officers "to talk to the defendant" only); *State* v. *Chapman*, 97 Ohio App. 3d 687, 690 (1994) (entry permissible because intent of police was "only to question a resident"). In our view, these cases do not focus on the pertinent inquiry, namely, the relationship of the party providing consent to the premises, and allow police to circumvent ascertaining whether a person is authorized to permit entry into a home. The decisions more fundamentally ignore the purpose of the Fourth Amendment and art. 14 to protect persons from any warrantless, nonconsensual government intrusion into their homes.

that Victor was inside, Victor could have been sleeping or in the bathroom, thus the absence of anyone preventing the unknown woman from answering the door or from allowing Desimone inside has no bearing. The reasoning by the Commonwealth, as well as the dissent, is founded on speculation, not real facts. The fact that the woman was an adult as opposed to a child is not a circumstance that eviscerates the information then believed by Desimone, namely, that Victor lived in room 138, and the ambiguity that arose from the actions of the unknown woman opening the door and agreeing to allow Desimone inside. The same can be said of the remaining factors and factors previously mentioned — that the woman did not seek permission or guidance from anyone inside room 138 before allowing Desimone to enter and that no one inside room 138 objected to her consent to Desimone's entry. In short, none of the factors negated the ambiguous situation faced by Desimone, which triggered a duty of diligent inquiry under art. 14. Because Desimone ignored facts calling into question the information he held (that Victor lived in room 138) and because Desimone did not conduct a diligent inquiry concerning the woman's relationship to the premises (and thus, authority to give consent), we conclude that his warrantless entry into the defendant's home was without valid consent, as it was not predicated on actual or apparent authority, and therefore violated art. 14.[15,16]

3. *Conclusion.* Fully recognizing that these types of cases turn on their individual facts, we conclude that the Commonwealth did not satisfy its burden in this case of establishing

_____

[15]We believe that the circumstances of this case should have triggered "further inquiry," *Illinois* v. *Rodriguez,* 497 U.S. 177, 188 (1990), under the Fourth Amendment, but we base our conclusion on art. 14. Because diligent inquiry was so plainly required in light of the ambiguous circumstances in this case, we decline to address the dissent's assertion that diligent inquiry regarding the consenting person's authority over the home is too severe a requirement to impose on police officers seeking consent for an entry or a search. *Post* at 403-404. We note that the requirement of diligent inquiry in *Commonwealth* v. *Porter P., supra* at 271-272, is triggered only where the person who granted consent to search a home did *not* have actual authority over the home, so the Commonwealth must rest on apparent authority to justify its search of the home.

[16]In view of our conclusion, we need not address the defendant's argument that the consent in this case was invalid because it was not freely and voluntarily given.

that the woman who answered the door to the defendant's home had authority to consent to Desimone's entry therein. We therefore affirm the judge's order allowing the defendant's motion to suppress.

*So ordered.*

GANTS, J. (concurring). I agree with the court that, because a warrantless entry into a home constitutes a search in the constitutional sense, "there is no reason *in this case* to draw a distinction between searches and entries of homes" (emphasis added). *Ante* at 394. I write separately to clarify that there is a distinction between a search of a home and entry into a home, which, although it does not affect the outcome of this case, may have bearing on the validity of consent in other search cases.

An entry into a home is more limited in scope than the search of a home. An entry is limited to the area of the home entered, which generally is an area to which all the inhabitants of the home have a shared right of access, such as a foyer, living room, or kitchen, and to objects that may be observed in plain view from the area entered. The scope of the entry does not generally include bedrooms or objects concealed from view. In contrast, a search of a home generally includes all areas of the home and all objects within the home, whether in plain view or concealed from view.

The cornerstone of the consent analysis is whether an individual has a shared right of access to the area being searched. See *Commonwealth* v. *Porter P.*, 456 Mass. 254, 264-265 (2010). An individual lacking a shared right of access to an entire home may nonetheless have sufficient shared access to permit entry into a foyer, living room, or kitchen. See 4 W.R. LaFave, Search and Seizure § 8.5(e), at 235 & n.117 (4th ed. 2004), and cases cited (guest who is more than casual visitor and has "run of the house" may have limited authority to allow police to enter area where visitors are normally received). The Commonwealth's claim of apparent authority fails here because the police officer did not know whether the unidentified woman who consented to his entry had a shared right of access to the room he entered.

But that does not suggest that the diligent inquiry required for apparent authority is identical for consent to enter an area with a shared right of access as for consent to search an entire home.

CowIN, J. (dissenting, with whom Spina, J., joins). In this case, the police officer believed that the person consenting to his warrantless entry had lawful authority to admit him to the premises. Because this belief was objectively reasonable, the entry did not violate the defendant's rights under the Fourth Amendment to the United States Constitution. Because the analysis of consent for the purposes of art. 14 of the Massachusetts Declaration of Rights should be no different than what takes place under the Fourth Amendment, the entry did not violate art. 14. The court concludes otherwise. Accordingly, I respectfully dissent.

The only evidence at the motion hearing was the testimony of Revere police Officer Mark Desimone. The judge found the following facts.[1] While Officer Desimone and his partner were on routine patrol at a motel, "Victor," the motel manager, asked Officer Desimone to pick up a syringe, "a service which the police routinely provide." The officers had to respond to another call, but said they would return to the motel to pick up the syringe later that night. They returned at approximately 10 P.M. The night clerks in the hotel management office told Officer Desimone that Victor was in his room, which the officer understood (from past conversations with Victor) to be room 138. This room was separate from the rest of the motel and was not regularly rented. The officer went to room 138, knocked on the door,[2] and a woman whom he did not know opened the door.

When the officer inquired if Victor was there, she said, "I don't know." He explained that Victor had asked him to pick up a needle, and asked the woman if he could come in. She responded, "yeah, sure." On entering room 138, he discovered that it consisted of two small, about "[e]ight by ten" bedrooms. The front door opened into one room, where the woman was

---

[1] I have supplemented the judge's findings with uncontested testimony as noted.

[2] Officer Desimone testified that he said, "Hello, Victor," while knocking on the door.

standing; four other persons, including the defendant, were in the next room. Officer Desimone did not see the other persons until after he entered room 138. Officer Desimone and his partner "lacked any information regarding whether 'Victor' was married, dating or living with anyone."

The Fourth Amendment permits an officer's warrantless entry onto private premises when a party consents to the entry and where the consent comes about by reason of either actual or apparent authority. Persons who own or rent the property entered or searched, or third parties who have "common authority" based on joint access to and control of the premises, have actual authority to consent to any entry.[3] See *Illinois* v. *Rodriguez,* 497 U.S. 177, 181 (1990); *United States* v. *Matlock,* 415 U.S. 164, 171 n.7 (1974). Apparent authority exists where the officer has a reasonable, but mistaken, belief that the consenting party has actual authority. *Illinois* v. *Rodriguez, supra* at 186. Whether the belief is reasonable without further inquiry is determined by evaluating objectively the context for that belief:

> "[D]etermination of consent to enter must 'be judged against an objective standard: would the facts available to the officer at the moment . . . "warrant a man of reasonable caution in the belief" ' that the consenting party had authority over the premises? . . . If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid."

*Id.* at 188-189, quoting *Terry* v. *Ohio,* 392 U.S. 1, 21-22 (1968). Even an invitation to enter, accompanied by an explicit assertion of actual authority, is insufficient if "surrounding circumstances [are] such that a reasonable person would doubt [the assertion's] truth and not act upon it without further inquiry." *Illinois* v. *Rodriguez, supra* at 188. The Fourth Amendment does *not,* however, require affirmative inquiry when the consenting party reasonably appears to have authority to consent. See *Georgia* v. *Randolph,* 547 U.S. 103, 122 (2006) ("*[Illinois* v.]

---

[3]The Commonwealth did not assert in the present case that there was actual authority. Without addressing whether actual authority may have existed here, I address the issue in the manner in which it was litigated, i.e., as a question whether there was apparent authority for the consent to enter.

*Rodriguez* held it would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent").

Here, because the woman said Officer Desimone could come in to room 138, she consented to his entry. The officer's prior experience indicated that room 138 was where Victor lived and was not being rented to others. Based on that understanding, the fact that the woman opened the door in response to "Hello, Victor," and the lateness of the hour, the officer could reasonably believe that the woman either shared the room with Victor or was otherwise authorized to be on the premises. If so, he could permissibly conclude that she had lawful authority to admit him to the unit. See *United States* v. *Matlock, supra* at 170.

The woman not only was inside the room and appeared to be a lawful occupant of the premises, but she also "acted at all times as though [s]he were the keeper of the door." *United States* v. *Rosario,* 962 F.2d 733, 738 (7th Cir. 1992). It can be inferred from the size of the small rooms that any other occupants would know that the woman answered the door, but there was no evidence that she sought guidance from anyone or behaved as though she needed approval. See *id.* at 737. Nor did any other occupants attempt to prevent her from either answering the door or admitting the person who sought entry.[4] See *id.* See also *United States* v. *Kimoana,* 383 F.3d 1215, 1225 n.7 (10th Cir. 2004). As a result, the officer had no reason to doubt the woman's authority to admit him.

Considering all the information available to the officer at the time, he had an objectively reasonable belief, grounded in known facts, that the woman was an occupant with actual authority to consent. The officer was entitled to rely on that apparent authority, and his entry did not violate the defendant's Fourth Amendment rights. For the same reasons, it did not violate the defendant's analogous art. 14 protection.

The court disagrees. It concludes that Officer Desimone faced an "ambiguous situation," *ante* at 395 n.12, based on two facts: a woman not known to the officers answered the door, and she gave an "ambiguous response" ("I don't know") to the officer's

---

[4]As stated, the officer was not aware of any other occupants until after the woman opened the door and admitted him.

inquiry about Victor's whereabouts. *Id.* Absent other indications that the woman lacked authority, the woman's presence at the door would not lead "a reasonable officer" to "doubt[] the woman's authority to consent," *ante* at 395. Because Officer Desimone knew nothing about Victor's personal life or living arrangements, the woman's presence neither reinforced nor undermined the officer's belief. Similarly, the woman's response to Officer Desimone's question was insufficient to render the officer's belief objectively unreasonable. The woman did not indicate that she did not know who Victor was, or that the room was not his; she only indicated that she did not know whether he was inside. See *United States* v. *Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996), cert. denied, 520 U.S. 1170 (1997) ("an officer does have discretion to interpret the factual implications of words in light of the context in which those words are spoken"). I do not agree that these two facts raised doubts sufficient to necessitate "further inquiry" pursuant to the Fourth Amendment standard articulated in *Illinois* v. *Rodriguez, supra* at 188-189, and I would not require any different analysis pursuant to art. 14.

The court applies to its art. 14 analysis the standard declared in *Commonwealth* v. *Porter P.*, 456 Mass. 254, 271-273 (2010) (*Porter P.*), a decision from which I dissented. In *Porter P.*, this court adopted, for the first time, the apparent authority doctrine with respect to cases arising under art. 14, but held that the doctrine applied "*only if* the reasonable mistake of fact occurs *despite* diligent inquiry by the police as to the consenting individual's common authority over the home" (emphasis supplied). *Id.* at 271. *Porter P.* further noted that a "diligent inquiry" requires two steps: the officer must "continue his inquiry until he has reliable information on which to base a finding of actual authority," and if presented with "contrary facts" he must "not only thoroughly question the individual consenting" but also evaluate the individual's credibility. *Id.* at 271-272.

Because the Fourth Amendment would not require a "further inquiry" in this case, I do not believe art. 14 requires a "diligent inquiry" either. By its plain language, however, *Porter P.* appears to presuppose that an "inquiry" is mandatory in every case. It suggests that, absent a colloquy with the consenting

party, an officer cannot have an objectively reasonable belief that actual authority to consent is present. If *Porter P.* is understood to require such a colloquy, it imports into the Declaration of Rights a harmful and unnecessary restriction on proper police performance that is nowhere found in the Fourth Amendment.

I do not believe art. 14 is violated when officers rely on objectively reasonable beliefs developed from context and past experience, rather than verbal inquiry. No similar inquiry requirement is imposed by Federal law, *unless* circumstances make the officer's belief unreasonable. Cf. *Georgia* v. *Randolph, supra* at 122 (declaring such requirement "unjustifiably impractical" when authority is "apparent"); *United States* v. *Almeida-Perez,* 549 F.3d 1162, 1170 (8th Cir. 2008) ("police are entitled to draw the usual inferences from what they see and hear, even though further inquiry might prove the inferences wrong"). The standard articulated in *Porter P.* transforms the Fourth Amendment inquiry requirement from an exception into a rule. Article 14 does not require that result.